**UNITED STATES of America,
Plaintiff,**

v.

**Andrew ACOSTA, Mohammed Ayesh, Doug Beyreis, Christopher Colton, Carlos Diaz, Shaun Dougherty, Jorge Espada, Vernon Fields, Felix Guzman, Jerry Guzman, Bernardo Hernandez, Raul Maldonado, Daniel Martinez, Pedro Martinez, Gamaliel Matos, Natanael Matos, Antonio Mendez, Alvaro Mendoza, Daniel Mendoza, Raciel Mendoza, Raymond Mendoza, Maico Navejar, Larry Ol-**

son, Thomas Overland, Raymond Rivera, Juan Roman, Michael Rosado, Mark Turner, Michael Turner, Alejandro Vallejo, Wilfredo Vasquez, Herminio Vega, Robert Weinstock, Defendants.

No. 98–CR–0104.

United States District Court,
E.D. Wisconsin.

Aug. 26, 2000.

Karene Moreno–Taxman, Milwaukee, WI, Christian R. Larsen, Madison, WI, for Plaintiff.

Gregory Parr, Parr Law Offices, Milwaukee, WI, for Andrew Acosta.

Michael Holzman, Rosen & Holzman, Waukesha, WI, for Mahammed Ayesh.

William (Chip) Burke, Burke Law Offices, Milwaukee, WI, for Doug Beyreis.

Robert Haney, Podell, Ugent, Haney & Delery, Milwaukee, WI, for Christopher Colton.

David Mandell, Mandell & Ginsberg, Madison, WI, for Carlos Diaz.

John Campion, Campion Law Offices, Racine, WI, for Shaun Dougherty.

Thomas Wilmouth, Wilmouth Law Office, Milwaukee, WI, for Jorge Espada.

Paul Barrett, Barrett & Letteney, Elkhorn, WI, for Vernon Fields.

Joan Boyd, Shawano, WI, for Felix Guzman.

Sheldon Nagelberg, Nagelberg Law Office, Chicago, IL, for Jerry Guzman.

Leonard Kachinsky, Kachinsky Law Office, Neenah, WI, for Bernardo Hernandez.

Michael Backes, Law Offices of Mike Backes, Milwaukee, WI, for Raul Maldonado.

Michael Goode, Goode & Associates, Chicago, IL, for Daniel Martinez.

Dianne Erickson, Wasielewski & Erickson, Milwaukee, WI, for Pedro Martinez.

Glenn C. Reynolds, Reynolds & Associates, Madison, WI, for Gamaliel Matos.

David Lang, Cameron & Penegor, Brookfield, WI, for Natanael Matos.

Dale Nikolay, Nikolay Law Office, Milwaukee, WI, for Antonio Mendez.

Thomas Kasen, Kasen & Patterson S.C., Wauwatosa, WI, for Alvaro Mendoza.

Joe E. Kremkoski, Kremkoski Law Office, Racine, WI, for Daniel Mendoza.

Larry Moon, Moon Law Office, Whitefish Bay, WI, for Raciel Mendoza.

Michael Schnake, Miller & Stansberry, Milwaukee, WI, for Raymond Mendoza.

Robert Baratki, Robert J. Baratki Law Office, Racine, WI, for Maico Navejar.

Matthew Ricci, Ricci Law Office, Milwaukee, WI, for Larry Olson.

John Cabranes, Hartig, Bjelajac, Cabranes & Koenen, Racine, WI, for Thomas Overland.

Douglas Bihler, Bihler & Kuehl, S.C., Milwaukee, WI, for Raymond Rivera.

Adam Essling, Milwaukee, WI, for Michael Rosado.

Christopher Lowe, Lowe Law Office, Wauwatosa, WI, for Michael Turner.

Scott Phillips, Law Office of Scott P. Phillips, Milwaukee, WI, for Mark Turner.

Winston Brown, Milwaukee, WI, for Alejandro Vallejo.

Patrick W. Blegen, Chicago, IL, for Wilfredo Vasquez.

Allan Krezminski, Milwaukee, WI, for Herminio Vega.

Patrick Cafferty, Weber & Cafferty, S.C., Racine, WI, for Robert Weinstock.

Michael J. Steinle, Milwaukee, WI.

*DECISION AND ORDER RE: DEFENDANTS PEDRO MARTINEZ AND ANDREW ACOSTA'S MOTIONS TO SUPPRESS STATEMENTS*

ADELMAN, District Judge.

Defendants Pedro Martinez and Andrew Acosta seek orders suppressing statements they made to FBI Special Agent Daniel Craft and other law enforcement officers. The credibility of Special Agent Craft's testimony in this case, regarding the circumstances in which in the statements were made, has been brought into question by his August 1999 conduct in an unrelated Minnesota case.

Magistrate Judge Patricia J. Gorence conducted evidentiary hearings on Martinez's motion on August 9, 1999; on Acosta's motion on August 26, 1999 and again on September 7, 1999; and a supplementary evidentiary hearing (regarding Special Agent Craft's conduct in the Minnesota case) on November 22, 1999. Magistrate Judge Gorence issued recommendations on November 26, 1999. (Docket # 1103 [hereinafter Acosta Recommendation I]; Docket # 1102 [hereinafter Martinez Recommendation I].[1]) Following timely objections, responses, a motion to reopen the evidentiary hearing, and recommitment, Judge Gorence held a second supplementary evidentiary hearing regarding Craft's conduct in Minnesota on January 5, 2000, and issued a new recommendation on May 8, 2000. (Docket # 1354 [hereinafter Rec-

ommendation II].) Martinez and Acosta again filed timely objections, and the government again filed a response. I review de novo those portions of the recommendations to which objections are made. *See* 28 U.S.C. § 636(b)(1).

## I. FACTUAL BACKGROUND

Martinez and Acosta were both named as defendants in a thirty-three defendant indictment issued in this district June 19, 1998. Martinez seeks to suppress statements that he made at the U.S. Attorney's office during a meting on April 30, 1998, and while Special Agent Craft drove him back to jail from that meeting. Acosta seeks to suppress statements that he made during an interview after he was arrested on July 2, 1998.

### A. Pedro Martinez Statements of April 30, 1998

#### 1. Preliminaries on April 27 and 28, 1998

In April 1998 Martinez was serving a 157–month sentence imposed by the Northern District of Indiana. He was brought to this district to appear in a line-up around April 27, 1998. Special Agent Craft testified before Judge Gorence that Martinez's sister, Andrea Martinez, called him April 27 to say that Martinez wanted to speak with him; Martinez denies asking anyone to call Special Agent Craft on his behalf. On April 28, 1998, Special Agent Craft brought Martinez to the U.S. Attorney's Office. (Transcript [docket # 990] of Aug. 9, 1999 Evid. Hr'g on Def.'s Mot. to Suppress Statements Made on 4/30/1998 at 13 [hereinafter Tr. 1].) Assistant U.S. Attorney Chris Larsen announced that Martinez could not be interviewed because it had not been determined whether Martinez was represented. Special Agent Craft then took Martinez to a conference room and remained with him, because he was in custody, for about an hour. AUSA Larsen, who also testified at the evidentiary hearing before Judge Gorence, recalled

---

**1.** Martinez Recommendation I also addressed Martinez's motion to suppress physical evidence seized at a duplex shared by Martinez and his sister, Andrea Martinez, on October 17, 1992. I considered and denied that motion in a decision and order issued August 11, 2000. (Docket # 1485).

that he might have gone in and out of the conference room two or three times during that period. AUSA Larsen and Special Agent Craft both describe the period as uneventful.

However, according to Martinez, Special Agent Craft introduced the topic of Sammy the Bull Gravano, an underboss of the Gambino crime family. Martinez testified that Special Agent Craft described Sammy the Bull as a mobster who confessed to nineteen homicides but served only five years because he cooperated against John Gotti. (Tr. 1 at 59.) Special Agent Craft denied discussing Sammy the Bull with Martinez on April 28, but acknowledged that he did discuss Sammy the Bull with other Latin King members (Tr. 1 at 35), and would tell them that Sammy the Bull cooperated and received leniency (Tr. 1 at 36–37). Martinez testified that he believed Special Agent Craft raised Sammy the Bull in order to obtain his cooperation. (Tr. 1 at 59.)

Martinez further testified that Special Agent Craft stressed that he might be able to get him a ten-year deal; said that he would testify at Martinez's sentencing hearing that he couldn't have completed the investigation without Martinez's cooperation; and predicted that Martinez probably would not serve more than seven years. (Tr. 1 at 59–61.) According to Martinez, Special Agent Craft emphasized that Assistant U.S. Attorney Karine Moreno–Taxman believed and trusted him and Detective Klabunde, and that she would be likely to follow any recommendation that he made. (Tr. 1 at 61.) Martinez testified that it was clear to him that Special Agent Craft was offering to work something out and to get a deal. (Tr. 1 at 83.) Special Agent Craft denies making any of these statements.

### 2. Scheduling of April 30 Meeting at U.S. Attorney's Office

Between April 28 and 30, 1998, prosecutors learned that Martinez's lawyers were representing him only on the appeal of his conviction in the Northern District of Indiana, but not regarding potential charges in this district. Prosecutors called a meeting with Martinez at the U.S. Attorney's Office to take place on April 30. AUSA Larsen testified that the meeting was designed "to explore his [Martinez's] potential cooperation." (Tr. 1 at 120.) Special Agent Craft testified that prosecutors were present in the hope that Martinez might offer to confess and incriminate others in exchange for a "promise" or "deal" that only a prosecutor could offer. (Tr. 1 at 47.) The government made no attempt to obtain counsel for Martinez at this meeting.

### 3. Special Agent Craft's Driving Martinez to April 30 Meeting

Special Agent Craft picked Martinez up from the Waukesha County Jail at approximately 1:10 p.m. and drove him to the U.S. Attorney's Office. According to Martinez, Special Agent Craft told him several times during this trip, "don't worry about the numbers, you'll be satisfied with the outcome," and Martinez responded that he wasn't going to cooperate if it meant getting a double-digit sentence. Special Agent Craft replied that if Martinez cooperated they might be able to have his new sentence run concurrently with his current sentence. (Tr. 1 at 70.) Special Agent Craft denies any such conversation occurred.

### 4. April 30 Meeting

The meeting at the U.S. Attorney's office lasted ten or fifteen minutes. Present were Martinez, Special Agent Craft, and AUSAs Moreno–Taxman and Larsen. Martinez initially thought that he had been summoned for the line-up for which he had been brought to this district. (Tr. 1 at 63.) According to Martinez, he asked Special Agent Craft and AUSA Moreno–Taxman what the line-up was about, and Special Agent Craft answered, "if you cooperate, we can make this disappear." (*Id.*) Special Agent Craft denies that this exchange occurred.

Prosecutors told Martinez that they had spoken with his Indiana lawyers; that those lawyers were representing him only on charges in Indiana and nothing else; and that the Indiana charges would not be discussed. Martinez acknowledges know-

ing that he could request a lawyer, and that he in fact told prosecutors that he was smart enough to decide what to do on his own. (Tr. 1 at 66, 86, 87.) Special Agent Craft testified that he thought that AUSA Moreno–Taxman asked Martinez if he wanted a lawyer present. (Tr. 1 at 41.) However, no one affirmatively explained to Martinez the procedure for getting a lawyer appointed, sought to obtain a lawyer for him, or provided him an opportunity to obtain a lawyer on his own.

AUSA Moreno–Taxman asked Special Agent Craft to read Martinez his Miranda rights; Martinez interrupted that he knew them better than Special Agent Craft and recited several from memory. Special Agent Craft then read Martinez his Miranda rights and asked Martinez if he wanted to speak without an attorney present; Martinez agreed to do so. (Tr. 1 at 17, 114.)

AUSA Moreno–Taxman told Martinez that she had evidence linking him to at least three homicides, and, on Martinez's account, went on to say that she was seeking the death penalty for certain defendants. (Tr. 1 at 67.) Special Agent Craft and AUSA Larsen both deny that the death penalty was discussed. (Tr. 1 at 107, 113–14.)

AUSA Moreno–Taxman then gave an account of how Angelique Morales's homicide came about. This prompted Martinez to correct parts of her account that he believed were mistaken, and thereby to implicate himself. According to Martinez, he asked for—and received—assurances that what he said would be off the record before each substantive comment. (Tr. 1 at 68, 69, 87, 89.) Special Agent Craft and AUSA Larsen both deny that Martinez was ever told that he could speak off the record. Special Agent Craft testified that Martinez asked only once whether he could speak off the record, and that AUSA Moreno–Taxman emphatically told him that everything was on the record. (Tr. 1 at 20, 42–43.) AUSA Larsen testified both to the question and the forcefulness of the

answer. (Tr. 1 at 115.) Martinez and Special Agent Craft both testified that once AUSA Moreno–Taxman said that everything was on the record, Martinez asked for time to think about it and the meeting broke up. (Tr. 1 at 20, 89.)

Martinez testified that he spoke only because AUSA Moreno–Taxman assured him that it was off the record; because Special Agent Craft had stressed a ten-year deal; and because he got scared when AUSA Moreno–Taxman said that she had evidence linking him to multiple homicides and then referred to seeking the death penalty. (Tr. 1 at 74.)

According to AUSA Larsen, no promises or threats were made during the meeting, and not only did no plea bargaining occur, prosecutors had not even discussed among themselves before the meeting the possibility of plea bargains. (Tr. 1 at 114.)

### 5. Special Agent Craft's Driving Martinez Back from Meeting

After the meeting, Special Agent Craft began driving Martinez back to the Waukesha County Jail. On the way, he bought a McDonald's lunch for Martinez, and Martinez asked him to pull over to the side of the road.[2] According to Martinez, he asked Special Agent Craft if they were being recorded and if they were off the record; Special Agent Craft told him that they were not being recorded and that they were just having a conversation, that it was off the record. (Tr. 1 at 71–72.) They then had a discussion of over an hour, during which Martinez apparently made many incriminating statements. Martinez testified that he spoke only because Special Agent Craft assured him that they were not on the record and because he believed that nothing he said would be used against him. (Tr. 1 at 72.)

### B. Andrew Acosta Statement of July 2, 1998

Acosta was arrested in Chicago at about 2:30 p.m. July 2, 1998,[3] and was taken to

---

**2.** According to Special Agent Craft, Martinez made the request so that they could talk; according to Martinez, it was so he could eat, although Martinez acknowledged that he was the passenger rather than the driver.

**3.** Acosta's initial motion (docket # 784) mistakenly referred to the date as July 6, 1998,

the FBI's offices at the Chicago federal building by FBI Special Agent Richard Hardgrave. Special Agent Hardgrave testified that Acosta was very pleasant given his circumstances; did not appear to be under the influence of alcohol or drugs; did not ask Special Agent Hardgrave for a lawyer; and did not make a request of anyone in Special Agent Hardgrave's presence for a lawyer.

Once at the FBI's offices, Acosta was taken to an interview room, where he was interviewed by Special Agent Craft and Milwaukee Police Department Detective Mike Kurowski. During this interview Acosta made incriminating statements. The interview began at approximately 3:30 p.m., and ended between 4:30 and 4:45 p.m. when FBI agents banged at the door and said that Acosta needed to be taken to court to be processed, because it was approaching 5 p.m. on the last business day before the Fourth of July weekend.

Acosta testified before Judge Gorence that he was not given Miranda warnings at the interview; that he was threatened that if he did not tell the truth, Special Agent Craft would have his mother and others charged with harboring a fugitive; that he repeatedly requested an attorney; and that Special Agent Craft and Detective Kurowski ignored his repeated requests for a lawyer.

Detective Kurowski and Special Agent Craft both testified before Judge Gorence that at the start of the interview Special

Agent Craft read Acosta his Miranda warnings and asked Acosta if he understood them; that Acosta said that he understood his rights and agreed to speak with them without a lawyer's presence; that no threats of any kind were made (including threats to charge Acosta's mother or others with harboring a fugitive); and that Acosta did not request a lawyer at any time during the interview.

## C. Special Agent Craft's Misconduct in Minnesota

The credibility of Special Agent Craft's testimony in this matter is undermined by his conduct in an unrelated case in Minnesota. On August 25, 1999, Special Agent Craft assisted Goodhue County, Minnesota law enforcement officers with the questioning of Dale Jensen, the primary suspect in the June 1995 disappearance of his girlfriend's three-and-a-half-year-old daughter, Jessica Swanson. That case was wholly unrelated to the Latin Kings investigation; Special Agent Craft was brought in from Milwaukee because of his expertise in interrogations.

■ At strategy sessions the day before Jensen's interrogation, a plan was agreed upon for Special Agent Craft to ignore Jensen's requests for counsel, if he made any, and to continue the interrogation.[4] Special Agent Craft knew that this plan would violate his professional obligations, but did not consult his superiors for guidance.[5]

---

but all parties agree that the correct date is July 2, 1998.

4. There were two strategy sessions, one in the morning with prosecutors and one in the afternoon without prosecutors. At the supplementary evidentiary hearings before Judge Gorence, Goodhue County Sheriff Dean Albers testified that the plan was openly discussed at the afternoon session and that he approved it. (Tr. [docket #1185] of Evid. Hr'g of Jan. 5, 2000 at 137 [hereinafter Tr. 3].) Goodhue County prosecutors denied asking or wanting Special Agent Craft to ignore Jensen's requests for counsel.

5. Special Agent Craft testified that he knew that his conduct violated FBI policy forbidding the questioning of the subject of a criminal investigation who has invoked the right to counsel. (Tr. 3 at 41, 60.) Special Agent

Craft further testified that he knew that the plan was at odds with his oath as a sworn officer to uphold the law and play by the rules (Tr. 3 at 69), and that he knew that it would likely result in Jensen's statements being suppressed (Tr. 3 at 47, 51).

In addition, the Fifth Amendment requires that questioning cease immediately when a suspect in custody requests an attorney. *See Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Special Agent Craft denies that Jensen was in custody, and thus denies that he violated the Fifth Amendment. Factors suggesting otherwise are that the interrogation lasted multiple hours; that it occurred at a police stationhouse; that the Goodhue County district attorney directed Special Agent Craft to treat Jensen as in custody for purposes of a state court decision

At the start of Jensen's interrogation, as planned in advance, another FBI special agent advised Jensen of his Miranda rights, including the right to an attorney and the right to stop questioning at any time to obtain an attorney. (Tr. 2 at 11–12.) Pursuant to state law and the district attorney's direction, the questioning was videotaped. During the interrogation, Jensen repeatedly requested a lawyer. Special Agent Craft ignored Jensen's requests; persisted in questioning Jensen; and ultimately secured a confession. At the evidentiary hearings before Judge Gorence, Special Agent Craft forthrightly testified that he ignored Jensen's videotaped requests for counsel.

## II. DISCUSSION

### A. Martinez's Statements

Martinez argues that his April 30, 1998 statements should be suppressed on constitutional, statutory, and ethical grounds: First, prosecutors and Special Agent Craft violated his Fifth Amendment and Miranda rights; second, his statements were protected under the Federal Rules protecting statements made in the course of plea bargain discussions; and third, prosecutors violated their ethical obligations by failing to inform him of the procedure for obtaining counsel and by failing to provide him a reasonable opportunity to do so.

### 1. Fifth Amendment Privilege Against Self–Incrimination

The Fifth Amendment requires law enforcement officials to advise suspects of their right to remain silent and to have a lawyer present before they begin custodial interrogations. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Even if Miranda warnings are given, a waiver of these rights is not voluntary, knowing, and intelligent if it is the product of intimidation, coercion, or deception. *See Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

that applied to suspects in custody (Tr. 3 at 38–39); that Jensen had been named in a criminal complaint; that an arrest warrant had been issued for Jensen; and that Jensen

Martinez was advised of his Miranda rights and knew that he had the right to remain silent and to request an attorney; indeed, he boasted that he knew his Miranda rights better than Special Agent Craft. He now argues that suppression is nonetheless required because he was intimidated by prosecutors' alleged reference to the death penalty, and was deceived by being told that he could speak off the record. I thus must determine whether the death penalty was discussed and whether Martinez was assured that he could speak off the record. I may accept the magistrate judge's credibility assessments without ordering a new hearing (which in any case Martinez has not requested). *See United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

Judge Gorence recommended finding that the April 30, 1998 meeting occurred as Special Agent Craft and AUSA Larsen described it. Martinez's objection is largely that his very different account is plausible, and therefore should be accepted. Having independently reviewed the transcripts of the evidentiary hearing, though, I see no reason to disturb this portion of the recommended finding. I specifically find that prosecutors did not tell Martinez that they were considering seeking the death penalty, and did not tell him that he could speak off the record, but rather told him that everything was on the record. On that basis, I do not find that Martinez's waiver of rights at the U.S. Attorney's office was the product of intimidation, coercion or deception. *See Moran,* 475 U.S. at 421, 106 S.Ct. 1135.

To determine whether Martinez's waiver of rights during the drive back to the Waukesha County Jail was the product of deception, I must assess the credibility of the witnesses to that conversation, Martinez and Special Agent Craft. The Recommendations recommended finding that Special Agent Craft's credibility in this case is not diminished by his conduct in the Minnesota case, on the ground that he

would have been arrested if he had attempted to leave. (Tr. [docket # 1101] of Evid. Hr'g of Nov. 22, 1999 at 56 [hereinafter Tr. 2].)

forthrightly and unwaveringly acknowledged his videotaped misconduct in that case. (Martinez Recomm. I at 28; Acosta Recomm. I at 13; Recomm. II at 5.) I find that Special Agent Craft's truthfully testifying to his recorded misconduct does not repair his reputation for truthfulness. After all, as part of the misconduct itself Special Agent Craft stood by in silence as another special agent, by prearrangement, told a suspect whom Special Agent Craft was about to interrogate that he could stop questioning at any time by requesting an attorney, even though Special Agent Craft planned to violate this promise. Special Agent Craft was thus a party to a deliberate lie.

■ In addition, a witness's credibility may properly be impeached based upon unrelated misconduct. This is why, subject to certain restrictions, a witness's prior felony convictions are admissible at trial. *See* Fed.R.Evid. 609(a)(1). Evidence of a conviction is required under the Rules of Evidence "only because it stands as proof of the underlying criminal act." *See id.* advisory committee's note to 1972 proposed rule ¶ 1. Special Agent Craft's misconduct in Minnesota is undisputed.

■ To be sure, commentators have properly questioned Rule 609's assumption that any felony conviction indicates a greater likelihood for untruthful testimony; it presumes a chain of inferences from a felony conviction, to being a bad person, to having a greater propensity for untruthfulness on the witness stand, none of which is necessarily a strong inference. But given

the kind of misconduct at issue here, the question of credibility is more relevant in this case than in the case of a generic felony. The plan in the Minnesota case was for Special Agent Craft to ignore Jensen's requests for counsel. Special Agent Craft knew that this plan would violate his professional obligations and was at odds with his sworn oath to uphold the law and play by the rules. Despite knowing this, he did not contact his superiors for guidance, and proceeded to engage in professional misconduct, not once but repeatedly through the course of the multiple-hour interrogation. Special Agent Craft's demonstrated willingness to violate his professional responsibilities in one area of his duties—deliberately, intentionally, and repeatedly—properly allows an inference that he might be willing to do so in other areas.[6] Thus I disagree with the Recommendations with respect to Special Agent Craft's credibility.

Even so, I do not accept Martinez's account of the crucial factors of the conversation during the car ride. As discussed above, I find that Martinez was not told at the U.S. Attorney's office that anything would be off the record, and was to the contrary told that everything was on the record. Special Agent Craft's account of the conversation in the car is of the same tenor as the facts as I find them to have been at the U.S. Attorney's office. On that basis, I do not find that Martinez's waiving his right to remain silent during the car ride was the product of a deceptive assurance that his statements were off the

6. The chain of inferences required here is from ignoring a suspect's repeated requests for counsel in order to obtain incriminating statements in knowing violation of professional obligations, to being less than scrupulous in carrying out one's professional duties, to being willing to shade or perjure one's testimony in order to get evidence admitted and to secure convictions. These inferences appear to be at least as strong as those suggesting that a generic felony indicates a greater propensity for untruthfulness on the witness stand. *See, e.g.,* David N. Dorfman, *Proving the Lie: Litigating Police Credibility,* 26 Am. J.Crim.L. 455, 498 (1999) ("[A] pattern of misconduct and deceit might prove that a police witness is self-interested in the arrest, prosecution, and conviction of this (or any) defendant. At the very least, such a pattern

could prove that the police witness is partial in his testimony, and therefore such bias serves to rebut any unstated presumption of credibility.")

Reliable evidence of a law enforcement official's misconduct in an unrelated case thus impeaches the official's credibility, particularly "where credibility is the central issue in the case and the evidence presented at trial consists of opposing stories presented by the defendant and government agents." *United States v. Kiszewski,* 877 F.2d 210, 216 (2nd Cir.1989). The potential misconduct at issue in *Kiszewski* may have been more than ten years old, while Special Agent Craft's misconduct occurred on August 25, 1999, between his first and second days of giving testimony in this case, August 9 and 26, 1999.

record. *See Moran*, 475 U.S. at 421, 106 S.Ct. 1135. I therefore find no Fifth Amendment violation.

### 2. Statements Made in Course of Plea Discussions

 Under the Federal Rules, statements that a suspect makes "in the course of plea discussions with an attorney for the government" are not admissible if a guilty plea does not result, subject to exceptions not relevant here. *See* Fed.R.Crim.P. 11(e)(6)(D); Fed.R.Evid. 410(4) (with "attorney for the prosecuting authority" rather than "attorney for the government"). The purpose of these rules is to protect the plea.bargaining process by encouraging discussions with a view toward reaching a plea agreement. *See* Fed.R.Crim.P. 11 advisory committee's note on 1979 amendment to (e)(6), ¶ 2. Whether a suspect's statements were "made in the course of plea discussions" turns upon the suspect's subjective expectation of negotiating a plea at the time of the discussion, and the reasonableness of that expectation given the totality of the circumstances. *See United States v. O'Brien*, 618 F.2d 1234, 1240–41 (7th Cir.1980).[7]

 I find that, even assuming that Special Agent Craft made the statements that Martinez attributes to him out of the presence of other witnesses, and even accepting that Martinez believed that Special Agent Craft raised Sammy the Bull on April 28, 1998 in order to obtain his cooperation, Martinez did not have objective reason to believe that he was participating in plea discussions on April 30, 1998.

Special Agent Craft visited Martinez in prison in June 1997, and according to Martinez, said that prosecutors in this district would be willing to recommend a downward departure in Martinez's Northern District of Indiana sentence in exchange for cooperation. (Special Agent Craft denies the claim.) But Martinez testified that he was not interested in following up on this alleged offer, and he does not claim

that it was a factor in his speaking on April 30, 1998.

Martinez's account of Special Agent Craft's Sammy the Bull dialogue on April 28, 1998 (which may well be credible, given that Special Agent Craft used the same dialogue with other suspects) indicates only that Special Agent Craft sought to persuade Martinez that it would be to Martinez's advantage to cooperate. Comments that things might go better for a suspect if he or she cooperates do not convert a suspect's subsequent efforts to cooperate, even if in hope of gaining leniency by a plea, into plea bargaining discussions. *See* Fed.R.Crim.P. 11, advisory committee's note on 1979 amendment to Rule 11(e)(6), ¶ 3. Special Agent Craft's alleged April 28 statement that if Martinez cooperated, Special Agent Craft would recommend a ten-year sentence to AUSA Moreno–Taxman, and that she would be likely to accept the recommendation, made clear that Special Agent Craft lacked authority to plea bargain on behalf of the prosecuting attorney and that he was not negotiating on her behalf.

To be sure, Special Agent Craft's alleged April 28 promise to testify on Martinez's behalf at his sentencing if he cooperated, and his alleged April 30 statements (while driving Martinez to the U.S. Attorney's office) that Martinez should not worry about the numbers and would be satisfied with the outcome, may well have led Martinez to believe that a plea bargain might be discussed at the meeting. Indeed, Special Agent Craft testified that prosecutors were present at the meeting precisely in case Martinez offered to confess in exchange for a promise or a deal.

However, I find that nothing occurred at the meeting to justify a reasonable belief on Martinez's part that it was a plea bargain discussion. Because of corroboration from AUSA Larsen, I find that Special Agent Craft did not answer a Martinez inquiry about the line-up which brought him to this district by saying, "if you coop-

---

7. The same rule is provided in *United States v. Sayakhom*, 186 F.3d 928, 935–36, *modified*, 197 F.3d 959 (9th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1216, 145 L.Ed.2d 1117 (2000), which Martinez urges the court to adopt.

erate, we can make that disappear." Martinez alleges nothing else that was said or done at the meeting which would have indicated that he was participating in a plea discussion.

This leaves Martinez's statements while Special Agent Craft was driving him back to Waukesha County Jail. Special Agent Craft told Martinez as at the end of the meeting at the U.S. Attorney's office that he was looking forward to working with him. Martinez testified that he interpreted this as Special Agent Craft's saying that he looked forward to negotiating a deal with Martinez. But even on Martinez's account, Special Agent Craft had already indicated that he could do no more than recommend a deal to prosecutors. This comment simply could not sustain a reasonable belief on Martinez's part that his future conversations with Special Agent Craft would in fact be plea discussions. Moreover, Rules 410 and 11(e)(6) are limited to statements made to government attorneys, and the Seventh Circuit has declined to extend them to statements made to law enforcement agents. *See United States v. Lewis*, 117 F.3d 980, 984 (7th Cir.1997); *United States v. Springs*, 17 F.3d 192, 195 (7th Cir.1994).

### 3. Special Responsibilities of a Prosecutor

Martinez's final argument is that suppression is required because prosecutors violated their ethical responsibilities. The ABA Model Rules provide that "the prosecutor in a criminal case ... shall make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel." *See* Model Rules of Professional Conduct Rule 3.8(b) ("Special Responsibilities of a Prosecutor"). This rule

has been adopted by the Wisconsin Supreme Court, *see* Wis.Sup.Ct.R. 20:3.8, and is thus incorporated by this district, *see* Local Rule § 2.05(a) (adopting Wisconsin Supreme Court Rules of Professional Conduct for Attorneys). In addition, the government requires its attorneys to comply with the ethical rules governing the courts in which they practice. *See* 28 U.S.C. § 530B(a).

Martinez contends that the U.S. Attorney's office violated Rule 3.8(b) because it made no effort on April 30, 1998, to inform him of the procedure for obtaining counsel or to give him an opportunity to do so, even though prosecutors had summoned him to a custodial interrogation; and further observes, citing *United States v. Hammad*, 858 F.2d 834, 842 (2nd Cir. 1988), that a defendant's incriminating statements obtained by virtue of prosecutors' ethical misconduct can be suppressed.[8]

#### a. Legal Standard: When Does Rule 3.8(b) Apply?

■ The government's first response (echoing the Recommendation) is that Rule 3.8(b) is inapplicable. Because there were no criminal charges yet pending against Martinez, the government contends that the U.S. Attorney's office was not "the prosecutor in a criminal case" under Rule 3.8; and, for the same reason, Martinez was not yet an "accused" under Rule 3.8(b). The contention is thus that the special responsibilities of a prosecutor arise only after formal proceedings are initiated.

Nothing in Rule 3.8(b) indicates that its three requirements—to advise of the right to counsel, to advise of the procedure for

---

8. Martinez first raised this issue in briefs submitted after a June 1, 1999 deadline, and so it might be considered waived. (Recomm. I at 28–29.) However, the underlying issue is whether prosecutors complied with the rules of professional responsibility and this court's Local Rules. Prosecutors' duties as attorneys practicing in this district extend beyond the obligation to respect defendants' rights. Ethi-

cal obligations are personal, and may not be waived. In addition, district courts may enforce their local rules sua sponte. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir.1994). Thus, even if Martinez had never raised the issue, I could raise it sua sponte. I therefore do not consider this issue waived.

obtaining counsel, and to provide an opportunity to obtain counsel—arise at different times. When it accrues may thus be assessed by its first requirement, that prosecutors make reasonable efforts to ensure that the "accused is advised of … the right to counsel." However, the rule's reference to "*the* right to counsel" is ambiguous, because there are two different rights to counsel: one under the Fifth Amendment and *Miranda*, which arises in the context of custodial interrogations (no matter whether before or after the initiation of formal proceedings), and a separate one under the Sixth Amendment, which arises only after the initiation of adversary proceedings. The question is thus which of these rights to counsel Rule 3.8(b) refers to and requires prosecutors to advise suspects of.[9]

*Miranda* specifically warned that the very fact of in-custody police interrogation creates compelling pressures. *Miranda*, 384 U.S. at 455, 467, 86 S.Ct. 1602. To counteract these pressures and ensure the voluntariness of any statements that are made, suspects have the right to have counsel present during questioning, and law enforcement officials must specifically advise them of this right to counsel before initiating questioning. *See id.* at 470–72, 86 S.Ct. 1602.

The government's position is thus that although *Miranda* may require them to advise a suspect facing custodial interrogation of the right to counsel, Rule 3.8(b) does not. Rather, the government contends that a prosecutor's ethical obligation to advise a defendant of the right to counsel arises only after formal judicial proceedings have begun and the Sixth Amendment applies. As stated above, the only analysis provided is based on the words of the Rule itself.

In fairness, few reported cases discuss the ethics rules governing prosecutors; as one commentator observed, "[t]here is an astonishing absence from appellate court decisions or reports by discipline groups of cases dealing with misconduct by prosecutors." Bennett L. Gershman, *The New Prosecutors*, 53 U.Pitt.L.Rev. 393, 445 (1992). The majority of the cases that do discuss prosecutors' ethical obligations, including *Hammad*, concern the general ethical rules limiting attorneys' communications with represented parties. *See* ABA Model Rule of Professional Conduct 4.2 (1983); ABA Model Code of Professional Resp. DR 7–104(A) (1969).[10] (These are

---

9. Two resources ultimately prove not to shed light on the question. The ABA has incorporated Rule 3.8(b)'s requirements into its proposed standards governing a prosecutor's role at the first appearance of the accused before a judicial officer. *See ABA Standards for Criminal Justice: Prosecution Function and Defense Function* § 33.10(a) (3d ed.1993). But these standards are silent as to whether Rule 3.8(b) applies before formal proceedings are initiated, and thus do not help here.

Similarly, the Wisconsin Bar has indicated that Rule 3.8 imposes duties on a prosecutor "[b]efore any court appearance has taken place and before defense counsel has been requested, retained or appointed." Prosecutor Contact with Unrepresented Criminal Defendant, State Bar of Wis. Standing Comm. on Prof'l Ethics Formal Op. E–92–6 (1992), *available in Wisconsin Ethics Opinions* 404 (1999). But this opinion's subject, the "criminal defendant," simply begs the question being asked here.

10. *See, e.g., United States v. Killian,* 639 F.2d 206, 210 (5th Cir.1981) (stating that where U.S. Attorney's office ordered FBI agents to interview defendant awaiting trial in custody and in absence of counsel in "truly reprehensible" and "highly improper and unethical" violation of ABA DR 7–104(A), suppression of resulting statements would probably have been appropriate sanction if government had not voluntarily declined to use them); *United States v. Lopez,* 4 F.3d 1455, 1464 (9th Cir. 1993) (agreeing that prosecutor who negotiated plea agreement directly with defendant behind defense counsel's back violated California rule tracking ABA Rule 4.2, but vacating district court's dismissal of indictment on ground that there was no showing of substantial prejudice to defendant); *In re Disciplinary Proceedings Against Brey,* 171 Wis.2d 65, 490 N.W.2d 15 (1992) (suspending license of prosecutor who, in addition to other misconduct, communicated directly with represented defendant in violation of Wis.Sup.Ct.R. 20:4.2, which adopts ABA Rule 4.2); *In re Disciplin-*

the rules that properly led prosecutors here to avoid interviewing Martinez on April 28 so they could find out whether his Indiana lawyers were representing him on anything other than those charges.)

In this case, the government's first argument is that Rule 3.8 refers to the "prosecutor in a criminal case," and therefore does not apply before formal adversary proceedings. However, Rule 3.8's first subsection forbids the same "prosecutor in a criminal case" from prosecuting a charge that he or she knows is not supported by probable cause. See Rule 3.8(a). On the government's theory, Rule 3.8 would allow a prosecutor ethically to seek an indictment for which he or she knows there is no probable cause, so long as he or she abandons the prosecution as soon as the indictment is issued, on the ground that there is a "criminal case" only after a formal charge is made. Although such a result is perhaps logically possible, it is utterly inconsistent with the commentary to Rule 3.8, the first sentence of which states that, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Wis.Sup.Ct.R. 20:3.8 cmt. I thus place no weight on Rule 3.8's referring to "the prosecutor in a criminal case" rather than "the prosecutor."

Accordingly, the only support for the government's position is simply that Rule 3.8(b)'s use of "accused" rather than "suspect" is more suggestive of the Sixth Amendment setting than the Fifth Amendment setting. On the other side, though, the Fifth Amendment and *Miranda* establish well-known requirements to advise suspects of the right to counsel, while any comparable rights under the Sixth Amendment are far less well known. In addition, it is highly consistent with the prosecutor's duty as a "minister of justice" to assure both that prosecutors themselves, as well as law enforcement officers under their direction, comply with *Miranda*'s requirement to advise all suspects of the right to counsel during custodial interrogation.

For these reasons, I do not believe that Rule 3.8(b) is limited to the Sixth Amendment right to counsel, and it therefore appears to require prosecutors to assure that "in-custody suspects who have not yet been formally charged are advised of their right to counsel." *ABA/BNA Lawyers' Manual on Professional Conduct* 61:611 (Susan Michmerhuizen et al. eds., 1997). I therefore find that all three of a prosecutor's special responsibilities under Wis. Sup.Ct.R. 20:3.8(b) arise before a suspect is formally indicted.

### b. Application to April 30 Meeting

I therefore must assess whether prosecutors complied with Rule 3.8(b) on April 30, 1998. Prosecutors called the meeting to explore Martinez's "potential cooperation," but they did not do so; did not request Martinez's cooperation; and did not even explain why he might be better off if he considered cooperating. To the contrary, prosecutors ensured that Martinez was given his Miranda rights, possibly asked him if he wanted a lawyer present, assured him that he would not be questioned about charges for which he had counsel, told him that he was a suspect in several homicides, and then provided an account of the Angelique Morales homicide in a manner that led him to incriminate himself. They made no effort to advise him of the procedure for obtaining counsel, and did not give him an opportunity to do so, both contrary to Rule 3.8(b)'s requirements.

Prosecutors next brought Martinez to meet with them approximately two weeks later, and did make efforts for him to have counsel at that meeting. At the evidentiary hearing before Judge Gorence, prosecutors could not identify any factor that led them to provide Martinez with the opportunity for counsel at the later meeting that was not present at the April 30 meeting. (Tr. 1 at 125.)

*ary Proceedings Against Dumke,* 171 Wis.2d 47, 489 N.W.2d 919 (1992) (same).

### c. Remedy for Tainted Evidence

 I thus must consider whether Martinez's statements should be suppressed even though there was no constitutional violation. The Supreme Court initially justified the suppression of tainted evidence from trial as required to avoid a further, independent violation of a defendant's rights. *See Mapp v. Ohio*, 367 U.S. 643, 648, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (describing history of exclusionary rule). Later decisions retreated from the view that the admission of wrongfully obtained evidence is itself a second wrong, *see United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), and have held that the Constitution requires exclusion primarily to deter future unconstitutional police misconduct, *see Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See generally* William C. Heffernan, *Forward: The Fourth Amendment Exclusionary Rule as a Constitutional Remedy*, 88 Geo.L.J. 799, 808–27 (2000).

Courts may also use their supervisory powers to protect their integrity by suppressing tainted evidence. *See McNabb v. United States*, 318 U.S. 332, 341–42, 63 S.Ct. 608, 87 L.Ed. 819 (1943) (courts must exercise their supervisory powers to avoid becoming a party to illegality or misconduct); *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *Miranda*, 384 U.S. at 463, 86 S.Ct. 1602 (remarking that for a quarter century, federal courts have avoided the need to reach the constitutional issues involved in exclusion by enforcing their supervisory rules). The supervisory power, like the exclusionary rule, has a twofold purpose of deterring misconduct and protecting judicial integrity; but even though it shares the same goals, it has independent power and is not superfluous. *See United States v. Payner*, 447 U.S. 727, 736 n. 8, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). *See also Dickerson v. United States*, — U.S. —, —, 120 S.Ct. 2326, 2332–33, 147 L.Ed.2d 405 (2000) (holding that whether Congress has power to overturn *Miranda* depends upon whether it was issued under the courts' supervisory powers or as an interpretation of the Constitution); *United States v. Cortina*, 630 F.2d 1207, 1215–16 (7th Cir.1980) (explicitly relying upon the court's supervisory power, rather than fact of constitutional violation, to exclude unconstitutionally gathered evidence).

 Regardless of whether exercised under the Constitution or the court's supervisory powers, suppression is a harsh remedy and is reserved for violations which infringe on basic rights. *See* Lyn M. Morton, *Seeking the Elusive Remedy for Prosecutorial Misconduct: Suppression, Dismissal, or Discipline?*, 7 Geo.J. Legal Ethics 1083, 1100, 1102 & n. 135 (1994). A balancing test is used to determine whether evidence should be suppressed, both in the constitutional and non-constitutional context. The deterrent and remedial effects of suppression are to be weighed against suppression's interference with the truth-seeking function of a criminal trial by barring relevant and trustworthy evidence. *See Illinois v. Gates*, 462 U.S. 213, 257, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (White, J., concurring) (tracing history of the Court's use of balancing tests to determine when the Constitution requires suppression); *Payner*, 447 U.S. at 734–35 & 736 n. 8, 100 S.Ct. 2439 (using balancing test to determine whether suppression was justified under court's supervisory powers).

It is important to note in this context that the rules of professional conduct are not intended to create substantive rights. *See* Wis.Sup.Ct.R. ch. 20 pmbl. ("Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached.... [N]othing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such duty."). *See also* 28 C.F.R. § 77.5 (providing that

the government's requiring its attorneys to comply with ethical rules does not create any right or benefit enforceable at law by adverse parties, including criminal defendants).

Even with these limitations, courts have on occasion found it appropriate to use their supervisory powers to suppress evidence gathered through prosecutorial misconduct that does not rise to the level of a constitutional violation. In *Hammad*, 858 F.2d at 842, the Second Circuit announced that suppression could be appropriate where an incriminating statement is obtained through violations of the rules limiting attorneys' communications with represented parties. The Tenth Circuit announced an even stronger rule in *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.1973), holding that suppression at trial was *required* in such cases. As noted above, the Fifth Circuit ruled in *Killian*, 639 F.2d at 210, that suppression would have been appropriate where prosecutors ordered FBI agents to take statements from a represented defendant in the absence of his counsel. The Ninth Circuit recently held that evidence obtained by a prosecutor's intruding upon the attorney-client relationship was correctly suppressed; the decision did not rest upon constitutional grounds. *See United States v. Haynes*, 216 F.3d 789, 796–97 (9th Cir.2000), *modified on denial of reh'g en banc*, Nos. 98–30221, 98–30232, 2000 WL 1145565 (9th Cir. Aug. 15, 2000).[11]

The Recommendation and the government seek to distinguish *Hammad* solely on the ground that it addressed prosecutorial misconduct under a different ethical rule than Rule 3.8(b). However, there is nothing in the nature of a court's supervisory powers that would allow a court to suppress evidence to enforce some but not all of its own procedures. The attempted distinction therefore fails.

The appropriateness of exclusion as a sanction for prosecutors' ethical violations is to be determined on a case by case basis. *See Hammad*, 858 F.2d at 842. I have found only one case discussing Rule 3.8(b) in a suppression context (issued after the parties' briefs and the magistrate judge's recommendation in this case). In *State v. Sosinski*, 331 N.J.Super. 11, 750 A.2d 779, 782 (2000), prosecutors ordered police not to give a suspect his Miranda rights after summoning him to police headquarters for questioning, and police (apparently on their own initiative) continued to question the suspect even after he requested counsel. The suspect's statement was obviously obtained in violation of *Miranda*, but under *Oregon v. Hass*, 420 U.S. 714, 723, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) and *Harris v. New York*, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the statement could constitutionally be used for impeachment purposes. The court thus specifically relied upon New Jersey Rule of Professional Conduct 3.8(b), and not the suspect's constitutional or Miranda rights, in holding that due to the "deliberate and unconscionable prosecutorial misconduct," the statements were suppressed for all trial purposes, including impeachment. *Sosinski*, 750 A.2d at 785.

In this case, Martinez was advised of the right to counsel; knew that he could request counsel; told prosecutors that he was smart enough to decide what to do on his own; and was possibly asked if he wanted counsel. Although Rule 3.8(b) should have prompted prosecutors to advise Martinez of the procedure for obtaining counsel and to provide him a reasonable opportunity to obtain counsel at the April 30, 1998 meeting, their shortcomings are far short of the *Sosinski* prosecutors'

---

11. In *United States v. Durham*, 475 F.2d 208, 211 (7th Cir.1973), the Seventh Circuit suppressed statements taken in the absence of counsel known to be representing the (not yet indicted) defendant, citing "ethical questions" and DR 7–104(A). Nonetheless, it based suppression upon a violation of then-current Sixth Amendment law, and declined to adopt a per se rule mandating the suppression of all such statements, *see id.* at 212 (Pell, J., concurring in part and dissenting in part).

ordering police *not* to give Miranda warnings. The conduct of the prosecutors here is not egregious, highly improper, or unconscionable.[12] Under the balancing test summarized by Justice White's concurrence in *Illinois v. Gates,* the statements should not be suppressed under this court's supervisory powers.

## B. Acosta Statement

Suspects in custody must be advised of their rights under *Miranda,* 384 U.S. at 474, 86 S.Ct. 1602, before being questioned, and (as noted above) all questioning must stop as soon as a suspect in custody requests an attorney, under both *Miranda* and *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880. In addition, a statement must be suppressed if it is made as a result of the defendant's will being overborne, for example, through psychological intimidation. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. McGuire,* 957 F.2d 310, 315 (7th Cir.1992). The questions initially presented are thus purely factual: Did Special Agent Craft advise Acosta of his rights? Did Acosta request an attorney? Did Special Agent Craft threaten to prosecute Acosta's mother if Acosta did not cooperate? All parties agree that the answer rests on credibility. The Recommendation urged me to find that the testimony of Special Agents Hardgrave and Craft and Detective Kurowski was credible, on the ground that their testimony was consistent and cumulatively outweighed Acosta's testimony. (Acosta Recomm. I at 12.) Moreover, the Recommendation found no evidence that Acosta's will was overborne. (*Id.*)

I am allowed to accept the magistrate judge's credibility assessments without ordering a new hearing (which in any Acosta has not requested). *See Raddatz,* 447 U.S. at 676, 100 S.Ct. 2406. As discussed

above, I do not adopt the Recommendations' recommended finding that Special Agent Craft's credibility in this case is undiminished by his conduct in the Minnesota case. Even so, I find that Detective Kurowski's testimony is sufficient to support a finding that Acosta was advised of his Miranda rights, did not request an attorney, and was not threatened with having his mother prosecuted. For that reason, I find that Acosta's Fifth Amendment rights were not violated.

**NOW THEREFORE, IT IS HEREBY ORDERED** that the magistrate judge's recommendations (Docket # s 1102, 1103 and 1354) are **ADOPTED** and **NOT ADOPTED** to the extent discussed above;

that defendant Andrew Acosta's motion to suppress statements made July 2, 1998 (originally misstated as· July 6, 1998) (Docket # 784) is **DENIED;**

and that defendant Pedro Martinez's motion to suppress statements made April 30, 1998 (docket # 800) is **DENIED.**

---

**12.** A federal judge is to "initiate appropriate action when the judge becomes aware of reliable evidence indicating the likelihood of unprofessional conduct by a judge or lawyer." Code of Judicial Conduct for United States Judges Canon 3B(3); *see also Houston v. Par-*

*tee,* 978 F.2d 362, 369 (7th Cir.1992). Especially because of the lack of precedent indicating that Rule 3.8(b) applies in Fifth Amendment settings, I believe that any sanction would be inappropriate.