750 A.2d 779 (2000)
331 N.J. Super. 11
STATE of New Jersey, Plaintiff-Respondent,
v.
James SOSINSKI, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 18, 2000.
Decided May 12, 2000.
Joseph W. Spagnoli, for defendant-appellant (Mr. Spagnoli, of counsel and on the brief, Lori Spagnoli, Cranford and William Welaj, Somerville, on the brief).
John J. Farmer, Jr., Attorney General, for plaintiff-respondent (Jafer Aftab, Deputy Attorney General, of counsel and on the brief).
*780 Before Judges PRESSLER, KIMMELMAN and CIANCIA.
The opinion of the court was delivered by KIMMELMAN, J.A.D.
Tried to a jury, defendant James Sosinski was convicted of endangering the welfare of a child, a second-degree offense, N.J.S.A. 2C:24-4b(4)(a) (count one); sexual assault, a second-degree offense, N.J.S.A. 2C:14-2c(4) (count three); official misconduct, a second-degree offense, N.J.S.A. 2C:30-2a (counts four and five); criminal sexual contact, a fourth-degree offense, N.J.S.A. 2C:14-3(b) (counts six and seven); and endangering the welfare of a child, a second-degree offense, N.J.S.A. 2C:24-4a (count eight).
Reasoning that the victims encouraged defendant's behavior and because it appeared at the sentencing hearing that the mitigating factors outweighed the aggravating factors, the trial court downgraded defendant's second-degree convictions one degree and sentenced defendant on count one to a prison term of four years. The sentences on the remaining counts were made concurrent so that defendant received an aggregate sentence of four years flat. The customary statutory penalties were imposed. Defendant seeks a reversal of his convictions on the following grounds set forth in his brief:
POINT IDEFENDANT WAS DENIED HIS RIGHT OF CONFRONTATION AS WELL AS HIS RIGHT TO A FAIR TRIAL AS A RESULT OF THE TRIAL COURT'S RULING PRECLUDING DEFENSE COUNSEL FROM INTRODUCING HIGHLY RELEVANT AND POTENTIALLY EXCULPATORY EVIDENCE UNDER THE GUISE OF THE RAPE SHIELD STATUTE.
POINT IITHE TRIAL COURT ERRED IN PERMITTING THE STATE TO UTILIZE THE STATEMENT TAKEN FROM DEFENDANT BY THE POLICE FOR IMPEACHMENT PURPOSES IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS.
A. FACTUAL INTRODUCTION
B. THE PREVAILING CASE LAW AND LEGAL PRINCIPLES
C. THE EGREGIOUS CONDUCT OF THE POLICE IN OBTAINING THE STATEMENT FROM DEFENDANT JUSTIFIED ITS SUPPRESSION NOT MERELY DURING THE STATE'S CASE-IN-CHIEF BUT FOR IMPEACHMENT PURPOSES AS WELL.
POINT IIITHE TRIAL COURT'S RESPONSE TO A PIVOTAL JURY QUESTION REGARDING DEFENDANT'S STATEMENT WAS SUFFICIENTLY INADEQUATE AS TO DENY DEFENDANT HIS RIGHT TO A FAIR TRIAL.
POINT IVTHE MOTION COURT INITIALLY ERRED IN RULING PURSUANT TO AN IN CAMERA HEARING THAT CERTAIN INFORMATION CONTAINED IN A MEDICAL DISCHARGE SUMMARY WAS INADMISSIBLE AND SHOULD NOT BE TURNED OVER TO THE DEFENSE, WHILE THE TRIAL COURT ERRED BY DENYING DEFENSE COUNSEL'S MOTION FOR A NEW TRIAL ON THIS BASIS.
POINT VDEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL AS A RESULT OF THE PROSECUTOR'S ELICITATION OF TESTIMONY CONNECTING HIM WITH INADMISSIBLE CRIMINAL OR QUASI-CRIMINAL CONDUCT OUTSIDE THE SCOPE OF THE INDICTMENT.
POINT VITHE TRIAL COURT IMPROPERLY RESTRICTED DEFENDANT'S RIGHT TO CROSS-EXAMINE J.D. BY PRECLUDING QUESTIONING REGARDING THE FACT THAT SHE HAD LIED TO THE POLICE.

*781 POINT VIITHE TRIAL COURT ERRED IN PERMITTING THE STATE TO ELICIT FRESH COMPLAINT TESTIMONY.
POINT VIIITHE TRIAL COURT ERRED IN DENYING DEFENSE COUNSEL'S MOTION FOR A NEW TRIAL SINCE THE JURY'S VERDICTS WERE CLEARLY AGAINST THE WEIGHT OF THE CREDIBLE EVIDENCE.
POINT IXTHE AGGREGATE EFFECT OF THE NUMEROUS ERRORS WHICH OCCURRED THROUGHOUT THE COURSE OF THE TRIAL DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL.
We have carefully considered these contentions and all supporting arguments advanced by defendant. We have thoroughly reviewed the record and are convinced that defendant's convictions must be reversed substantially by reason of the arguments raised in Point II. We conclude that the trial court erred in permitting a non Mirandized[1] statement obtained from the defendant by the Linden police and an officer of the Union County Prosecutor's Office to be used for impeachment purposes when defendant testified at trial.
Factually, defendant was a Linden police officer who supervised juveniles sentenced to do community service. They met with him on Saturdays in a community police trailer. The alleged criminal activity occurred on three separate occasions with J.D., a fifteen-year-old female, and N.G., a sixteen-year-old female, both of whom were sentenced to perform community service for shoplifting offenses.
Defendant first met J.D. in mid-June 1997. Towards the end of June while defendant was driving his patrol car, he noticed J.D. who approached his vehicle. She asked defendant to drive her to N.G.'s house. Upon their arrival while defendant was still in his patrol car in N.G.'s driveway, J.D. showed him a white-covered photo album containing approximately twenty-four photographs of herself and her boyfriend, many of which were sexually explicit. The photos depicted J.D. in various stages of undress and showed her engaging in sexual activity with her boyfriend. Defendant looked through the album as J.D. went to the house to get N.G. When they returned, J.D. took the album back.
On July 12, 1997, N.G.'s mother dropped the two girls off at the community service trailer because N.G. had community service to perform under defendant's supervision. J.D. had already completed her service but defendant nevertheless allowed her to accompany N.G. At the trailer, J.D. again showed the white-covered photo album to defendant. During that same morning, defendant is said to have massaged J.D.'s shoulder, kissed her on the cheek, and squeezed her buttocks.
According to the State's evidence, during the lunch hour that day, defendant and the girls went their separate ways. At approximately 1:00 p.m., the girls returned to the trailer and defendant returned shortly thereafter. Defendant then dismissed everyone else who was performing community service but allowed J.D. and N.G. to stay. J.D. asked defendant if he could take pictures of herself and N.G. with a Polaroid camera that was in the trailer. Photos were taken while J.D. was wearing a police hat and suggestively removing her bra strap. N.G. also took J.D.'s photo as she held a police nightstick across her chest and had placed handcuffs on her leg. J.D. and defendant then asked N.G. to leave the room. J.D. then removed her thong and posed for a photograph with the nightstick between her legs. After the photo was taken, defendant is said to have inserted his left index finger into her vagina. Later, defendant is said to have kissed J.D.'s left breast. Several other sexually suggestive photos with the nightstick were taken. At about 2:00 p.m., the girls left the trailer and J.D. took with her all but one of the photos.
*782 N.G. returned to the trailer on Saturday, July 26, again accompanied by J.D. Sometime during that morning, defendant is said to have had familiar physical contact at separate times with both J.D. and N.G. although they were both clothed.
On Saturday, August 2, 1997, when N.G. returned for her third day of community service, she was again accompanied by J.D. During some play with defendant's handcuffs, defendant is said to have placed J.D.'s right hand on his penis and to have attempted to push her head toward his penis. She resisted. Whatever transpired between J.D. and N.G. with defendant then appears to have ended.
On August 5, 1997, J.D.'s mother found the white-covered photo album depicting J.D. and her boyfriend and the other Polaroid photos in J.D.'s book bag. The mother discussed the matter with her husband and eventually all of the photos were turned over by J.D.'s father on August 6 to Lieutenant Kovac of the Linden Police Department. J.D. was interviewed that evening and again on the 7th and 11th of August, 1997. In her August 7, 1997, statement J.D. claimed that defendant had touched her, had digitally penetrated her, and had engaged in sexually explicit conversations. N.G. was also interviewed but her statement was not as inclusive. Defendant only admitted taking one non-incriminating photo of J.D. while she was wearing his hat.
The State's proofs also showed that on August 7, 1997, the same day that J.D.'s incriminating statements were made, Lieutenant Johnson, who was supervisor of the Major Crimes Unit of the Union County Prosecutor's Office, obtained from a Superior Court judge a warrant for the arrest of defendant. The warrant charged defendant with sexual assault and child endangerment. Johnson then took the warrant back to his office. He informed Police Lieutenant Kovac that the arrest warrant had been obtained. He discussed the arrest warrant with two assistant prosecutors from the Union County Prosecutor's Office and the fact that on the next day defendant would be called in for questioning. Johnson was specifically instructed by the two assistant prosecutors not to give Miranda warnings to defendant because they reasoned that defendant would not think he was in custody at the time of the interview, and therefore there would be no need for the Miranda warning.
Johnson attested to these facts at the pretrial Burris[2] hearing held to determine whether defendant's statement could be used at trial for impeachment purposes should defendant elect to testify. The instruction given to Johnson by the prosecutors was contrary to his training and experience. He said that the questioning of defendant on the next day, in his view, would constitute a custodial interrogation and that since he would have an arrest warrant for defendant in his pocket, defendant should be advised of his Miranda rights. However, he acknowledged that he was overruled by the assistant prosecutors whom he regarded as his superiors and more knowledgeable regarding legal matters.
On August 8, 1997, defendant was called into the juvenile bureau of the Linden Police Headquarters. Johnson, Kovac and Detective Spano of the Linden Police Department were present. The interview was tape recorded and lasted about five to seven minutes. At the outset, defendant was informed that this was a criminal investigation involving some photographs of a young girl who was accusing him of taking photos and digitally penetrating her. Defendant was told that these charges would require a criminal investigation. Defendant was not Mirandized. Defendant responded to some questions but then indicated that he should have his PBA representative and a lawyer present. Johnson said, "that's fine ... [y]ou're entitled to that," and then informed defendant *783 that he was going to be charged with certain crimes.
According to Johnson, the interview was not terminated when defendant indicated that he wanted a PBA representative and attorney present because defendant continued to talk. Johnson continued to ask questions. Defendant was then asked to surrender his weapon, and Johnson asked defendant, "[i]f there's anything you have to tell us, please tell us about it." Defendant admitted taking some of the photos. Johnson then advised defendant that out of fairness to him, he had to advise defendant that he was under no obligation to make any statement. After some more questioning by Johnson, defendant said he'd rather have an attorney present. The interrogation was then terminated.
At the conclusion of the Burris hearing, the trial judge ruled that defendant's statement should be suppressed for violation of defendant's Miranda rights but, nevertheless, could be used for impeachment purposes. The court said:
What is known to this court just from the record is that we have a police officer before us who is being questioned by other officers and ... one member of the Prosecutor's Office.
What I do know from the testimony of Captain Johnson was that this whole procedure took 5 to 7 minutes.... There is not repeated questioning. There is no evidence whatsoever that the defendant's will was overborne by the officers. There's no repetition. There's nothing to indicate his physical state and mental state was other than perfectly normal. And ... there is no indication there was anything other than a voluntary statement other than the fact that the Miranda warnings were not given and clearly should have been given.
So under State v. Burris it appears to me that I have no real legal choice other than to allow this statement to be used for impeachment purposes because there's absolutely no evidence that the defendant's will was overborne and [that] this was an involuntary statement in fact. However, in saying that, that's not to say that I condone what occurred here because as with Captain Johnson, I think not only was this highly unusual but I think it was just wrong. And looking at the transcript clearly the defendant does ask for counsel, and therefore there was an abrogation of his right to counsel....
So even though this was involuntary in law because it was in violation of the rights, I find it was voluntary in fact from reading the statement itself and from the testimony of Detective Johnson, and therefore I must allow it to be used for a very limited purpose only of course if the defendant testifies and if he says anything that is directly in conflict with any statement in the statement.
At the trial, defendant testified and was cross-examined as to inconsistencies between his direct testimony and the statement made by him on August 8, 1997. At the conclusion of the case, the trial court, as required by Burris, instructed the jury that the statement could not be used as evidence of defendant's guilt but could only be used to affect his credibility.
The general rule in most, if not all jurisdictions, is that a voluntary statement obtained from a defendant without Miranda warnings or in violation of the Fifth Amendment may be used to impeach a defendant's testimony at trial. See Oregon v. Hass, 420 U.S. 714, 723, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570, 578 (1975) (holding that a defendant's statement, made after invoking his right to counsel, was admissible to impeach defendant's testimony at trial, though not admissible on the State's direct case); Harris v. New York, 401 U.S. 222, 226, 91 S.Ct. 643, 646, 28 L.Ed.2d 1, 5 (1971) (holding that a statement made without a Miranda warning was admissible to impeach defendant's trial testimony).
*784 This rule was recently considered in State v. Burris, 145 N.J. 509, 679 A.2d 121 (1996). In Burris, the defendant was asked to come to police headquarters for questioning regarding the death of her mother. Id. at 514, 679 A.2d 121. Defendant was read her Miranda rights and upon continued questioning she gave a non-incriminating statement. Id. at 514-15, 679 A.2d 121. Defendant then asked for a lawyer and refused to answer any further questions. Id. at 515, 679 A.2d 121. Nevertheless, the police questioning continued. Ibid. After several hours of questioning, defendant finally did give a statement confessing to the crime of murder. Ibid. The statements given by defendant were admittedly taken in violation of her Miranda rights but were allowed by the trial court to be used to impeach defendant's credibility on cross-examination. Ibid.
In affirming the trial court, the Burris Court first noted that the impeachment exception to the Miranda rule is "strictly limited to situations in which the suppressed statement is trustworthy and reliable in that it was given freely and voluntarily without compelling influences." Id. at 525, 679 A.2d 121. Next, the court explained that "[T]he critical issue that must be addressed ... centers on the meaning of voluntariness as an element of trustworthiness." Ibid. The Court further said:
The United States Supreme Court observed that a determination of whether a statement is voluntary entails a factual inquiry. It requires careful evaluation of all the circumstances of the interrogation, and, ultimately, the question is whether the defendant's will was overborne. [Mincey v. Arizona, 437 U.S. 385, 397-98, 98 S.Ct. 2408, 2415-16, 57 L.Ed.2d 290, 303-04 (1978).] The Supreme Court has recognized that if the defendant's will was overborne, the confession is not the "product of a rational intellect and a free will." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, 249 (1960). A confession that is not the product of such "rational intellect" and "free will" is involuntary and is violative of the Due Process Clause of the Fourteenth Amendment. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Reck v. Pate, 367 U.S. 433, 435, 81 S.Ct. 1541, 1543, 6 L.Ed.2d 948, 950 (1961); Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936).
[Id. at 525-26, 679 A.2d 121.]
Although our Supreme Court acknowledged that it could not "ignore police misconduct in obtaining evidence[,]" it also observed that "the concern about police misconduct that may follow from an impeachment exception to the exclusionary rule is highly generalized and speculative." Id. at 529, 679 A.2d 121. Trial courts were instructed to be "especially cautious" when considering whether to permit a statement obtained in violation of a defendant's Miranda rights to be used for impeachment purposes. Id. at 535, 679 A.2d 121.
Certain police misconduct may be overlooked if conducted in good faith. See United States v. Leon, 468 U.S. 897, 905, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677, 686-87 (1984) (articulating the good faith exception to the warrant requirement); cf. Hass, supra, 420 U.S. at 723, 95 S.Ct. at 1221, 43 L.Ed.2d at 578 (indicating that defective Miranda warnings given by officers acting in good faith still serve the deterrent effect sought by Miranda). Such indulgence, however, does not apply to prejudicial prosecutorial misconduct. State v. Feaster, 156 N.J. 1, 59, 716 A.2d 395 (1998); State v. Harris, 156 N.J. 122, 194, 716 A.2d 458 (1998); State v. Swint, 328 N.J.Super. 236, 261, 745 A.2d 570 (App.Div.2000).
In none of the United States Supreme Court cases or other federal and state cases relied upon by the Court in Burris was the failure to give a Miranda warning or the failure to observe Miranda rights once exercised by the accused the result of specific instructions from the prosecuting *785 attorney. Thus, these cases were willing to overlook police overzealousness. Their rationale, however, does not extend to prosecutorial overzealousness which deprives a defendant of his Miranda rights.
The instruction of the assistant prosecutors given to Lieutenant Johnson to dispense with the Miranda warnings for defendant clearly constituted egregious misconduct. Such misconduct offends our sense of justice and fair play. It was a deliberate and outrageous attempt on the part of the assistant prosecutors to ensnare defendant by depriving him of his fundamental rights. Their primary duty was, and remains, "not to obtain convictions but to see that justice is done." State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999) (quoting State v. Ramseur, 106 N.J. 123, 320, 524 A.2d 188 (1987)); State v. Loftin, 146 N.J. 295, 386, 680 A.2d 677. Their duty was, and remains to "refrain from using improper methods calculated just to produce a conviction." Loftin, supra, 146 N.J. at 386, 680 A.2d 677 (1996); Frost, supra, 158 N.J. at 83, 727 A.2d 1. The classic statement of the United States Supreme Court concerning the duty of a prosecutor bears emphasis: "He may prosecute with earnestness and vigorindeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).
Moreover, the misconduct of the assistant prosecutors runs counter to the Rules of Professional Conduct governing attorneys in this State. RPC 3.8 provides:
The prosecutor in a criminal case shall:
(b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel;
In effect, our Rules of Professional Conduct are designed to make it a professional obligation on the part of assistant prosecutors to assure that a key Miranda right is honored. Such misconduct on the part of the assistant prosecutors by itself renders defendant's statement unuseable even for impeachment purposes on cross-examination of defendant.
According to his Burris hearing testimony, Lieutenant Johnson knew that the prosecutors' instructions not to Mirandize defendant were wrong. He had a warrant for defendant's arrest in his pocket and was prepared to execute it. He knew that defendant would be in police custody during the interview and that a Miranda warning was required. He refrained from doing so and followed the prosecutorial mandate only because the assistant prosecutors were his superiors.
Nevertheless, the interrogation of defendant did take place. When defendant asked for the presence of a PBA representative and counsel, Lieutenant Johnson was required to back off right then and there. Henry v. Kernan, 197 F.3d 1021, 1028 (9th Cir.1999). He did not back off. Instead, he simply continued to question defendant as if no request had been made. That conduct has heretofore been held to be a tactic designed to generate a feeling of helplessness in the accused indicative of a deliberate course of action in violation of Miranda, therefore rendering the statement obtained inadmissible for any purpose. Ibid.
Under these circumstances, the misconduct of the assistant prosecutors resulted in the denial of defendant's Miranda rights. We cannot condone this deliberate effort to deprive a defendant of rights assured him by the federal Constitution. Defendant is entitled to redress in light of this deliberate and unconscionable prosecutorial misconduct. It is well settled in this State that a prosecutor's obtaining of an indictment based upon conduct that is grossly violative of a defendant's constitutional rights or that is otherwise characterizable as fundamentally unfair, requires dismissal of the indictment if there are no available alternative measures or lesser sanctions to redress the wrong to defendant *786 and to protect the integrity of the criminal trial. See State v. Long, 119 N.J. 439, 477, 575 A.2d 435 (1990); State v. Sugar, 84 N.J. 1, 14-15, 417 A.2d 474 (1980). We are satisfied that the only remedy for the unconscionable misconduct here is the exclusion of the statement so obtained for all trial purposes.
Defendant's statement given on August 7, 1997, shall not be admitted either for purposes of substantive evidence or impeachment. For the foregoing reasons, defendant's convictions are reversed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] State v. Burris, 145 N.J. 509, 679 A.2d 121 (1996).