**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1995-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ROBERTO C. GRILLO,
a/k/a CARLOS C. GRILLO,
CARLOS GRILLO, ROBERT
GRILLO, ROBERTO C.
GRILLOPIMIENTA, ROBERTO
GRILLO PIMIENTA,
ROBERTO C. PIMIENTA,
ROBERTO PIMIENTA, and
ROBERT G. PRIMIENTA,

     Defendant-Appellant.

_____

Submitted February 8, 2021 – Decided May 7, 2021

Before Judges Messano, Suter and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-05-0354.

Joseph E. Krakora, Public Defender, attorney for appellant (Tamar Y. Lerer, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Valeria Dominguez, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Roberto C. Grillo of the murder and felony murder of Yolanda Vega, who was killed in her Rahway home, which she shared with her sister, Canda Rivera. Defendant had been in a long-term relationship with Rivera, and they had a four-year-old son together, who lived in the home with his mother, Rivera's three other children, and Vega's two children. After appropriate mergers, Judge Robert Kirsch sentenced defendant to a fifty-five-year term of imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the murder conviction, and he imposed concurrent sentences on the related armed burglary, weapons offenses, and criminal trespass convictions.

Before us, defendant raises the following points for consideration:

POINT I

DEFENDANT'S WAIVER OF HIS MIRANDA[1] RIGHTS WAS NOT MADE KNOWINGLY AND INTELLIGENTLY BECAUSE HE WAS NOT MADE AWARE OF THAT HE WAS BEING INTERROGATED IN REGARD TO A HOMICIDE

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

AND THAT THE STATE HAD ALREADY OBTAINED A SEARCH WARRANT FOR HIS BELONGINGS.[2]

POINT II

THE WARRANTS FOR DEFENDANT'S PROPERTY AND PERSON WERE NOT BASED ON PROBABLE CAUSE. THE EVIDENCE TAKEN PURSUANT TO THOSE WARRANTS MUST BE SUPPRESSED.

POINT III

THE TRIAL JUDGE IMPERMISSIBLY CONDITIONED DEFENDANT'S RIGHT TO TESTIFY ON THE POSSIBILITY OF BEING CONFRONTED WITH EVIDENCE THAT THE STATE DISCLOSED MID-TRIAL AND DEFENDANT HAD NOT HAD A CHANCE TO INSPECT.

POINT IV

DEFENDANT'S SENTENCE IS EXCESSIVE.

Having considered these arguments in light of the record and applicable legal standards, we affirm.

I.

Defendant and Rivera lived together for some time before separating in December 2014. Defendant moved in with his sister, and Rivera moved in with

---

[2] We have eliminated the subpoints in defendant's brief.

3

Vega. Defendant had been to Vega's home several times for family events, and even though he and Rivera no longer lived together, defendant regularly picked up his son and Rivera's other children from the house and took them to school.

Shortly after defendant and Rivera separated, defendant was charged with having sexually assaulted Rivera's daughter, F.R. (Francine), over a period of several years.[3] Vega was a witness in the investigation, which led to defendant's indictment for aggravated sexual assault in Essex County. Additionally, Vega testified against defendant at a hearing pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. By summer 2015, a final restraining order was in place that barred defendant from having contact with Rivera and her children, including defendant's son.

On the afternoon of December 6, 2015, Vega's seventeen-year-old son, J.T. (Jack), came home from work to change clothes; he was going to dinner with D.H. (Don), Vega's son from a prior relationship with Freddie Hernandez, who was picking up both boys. Don had spent the day with his mother, and Jack saw her briefly before Hernandez arrived around 5 p.m. and the boys left with him. When Jack called his mother on the way home from the restaurant at 6:08 p.m., the call went straight to her voicemail.

---

[3] We use initials and a pseudonym pursuant to Rule 1:38-3(d)(11).

A-1995-18

Vega's two cars were still in the driveway and the front door was unlocked when the boys returned home after dinner. Jack called out and looked around the house for his mother; he found it strange that she had not answered his phone call or greeted them when they arrived. About thirty minutes later, Jack discovered a note in the living room with the words "went out" on it. This was odd, because Vega usually texted her sons when she went out and told them exactly where she was going. The handwriting on the note was not Vega's.

At 7:52 p.m., Jack received a text from his maternal aunt, Marlene DeRosa. It was DeRosa's birthday, and Vega had told her she would stop by in the evening; but she never came, was not responding to DeRosa's texts, and she and Vega's mother were worried. Jack told DeRosa that his mother was not home, and the two discussed the note she purportedly left.

Jack went upstairs to his mother's bedroom to see if he could compare the handwriting on the note to his mother's. The closet door was shut, which Jack thought was unusual. When he opened the closet, Jack saw a light-skinned man inside wearing black clothes, gloves, and a black mask with cut-outs for his eyes. The man pointed a gun at him, and Jack screamed, slammed the door shut, and ran out of the house.

A-1995-18

Seconds later, Don came out of his bedroom and saw a masked man dressed in black holding a gun and walking toward him from his mother's room. The man told Don to "go back," so he did, closed the bedroom door and called 9-1-1. He also tried calling his mother's phone, but the call went straight to her voicemail.

Jack ran to a neighbor's home, yelling for someone to call 9-1-1 because there was an armed intruder in the house and Don was still inside. The neighbor, Raynard Williams, walked toward Vega's home and saw a man in dark clothing holding a yellow bag walking away. When he called out, the man started running, and Williams gave chase but did not catch him. Police arrived minutes later and, although Williams told them about the man, the officers went directly into Vega's house without searching the area.

Police did not find Vega in the house. They took statements from Jack and Don, and Jack turned over the note. There were no signs of forced entry, and no evidence that anything had been taken. Additional family members and friends began to arrive at Vega's home.

While police were there, Francine found a shirt in the basement that appeared to be blood-stained; she gave it to the officers. The basement was in an unusual state of disarray. At trial, Francine explained that the shirt was hers,

A-1995-18

and that she, her mother, and her siblings kept their clothing in boxes in the basement. A forensic expert later determined that the blood on the shirt matched Vega's DNA. Police conducted a K-9 search of the entire house, including the basement, but did not find anything.

After police left around midnight, the family continued to try to contact Vega. At approximately 3:45 a.m., Rivera and her current boyfriend Rafael,[4] who had arrived at the home, went into the basement to get some clothing. Rivera noticed a curtain draped over some boxes; thinking it unusual, she asked Rafael to move the boxes, which he did. He screamed and told Rivera to go upstairs. Hearing the shouts, Hernandez ran downstairs, and Jack followed, where he saw Hernandez and Rafael drag his mother out from behind the boxes and curtain. Vega's face was bloody, and her body was cold and stiff. Jack called 9-1-1, and police arrived for a second time. Vega was dead; the medical examiner testified the cause of death was ligature strangulation.

Meanwhile, at 9:49 p.m. police officers in neighboring Linden were dispatched to the Phillips 66 Refinery on a report of an individual wearing a black cape and a mask walking along train tracks on the property. On arrival, police observed someone wearing a mask, a black skirt and what officers

---

[4] His last name does not appear in the record.

referred to as a black "shawl" or "scarf," and arrested him for trespass; it was defendant. The area of the refinery where defendant was arrested is less than one mile from Vega's home. Defendant was transferred to the Union County Jail at approximately 1:10 a.m. on December 7, 2015.

On December 10, prosecutors applied for a warrant to search the personal property, including two cellular phones, seized from defendant on his arrival at the jail and to take buccal swabs and "major case" fingerprints from defendant. On December 11, prosecutors applied to a different judge for a warrant to search defendant's bedroom and to seize and forensically examine his computer. Each judge found there was sufficient probable cause and issued the requested warrant.

The evidence obtained through execution of these warrants included: the shoes defendant was wearing when arrested, which expert testimony confirmed had Vega's blood on them; defendant's other clothing taken at the time of his arrest, including a black skirt, a black bed sheet, and a black face covering; paperwork from defendant's bedroom in his handwriting; and computer records showing many recent searches on Google Maps for Vega's home address and other nearby addresses in Rahway and Linden.

A-1995-18

Also, on December 10, prosecutors interviewed defendant at the Homicide Task Force offices. After waiving his Miranda rights, defendant provided a lengthy statement, which the jury saw and heard in redacted form. Defendant described his whereabouts on December 6–7 and the clothing he was wearing when arrested. However, he steadfastly denied that he was at Vega's house.

On December 15, Patrick Cassio, whose home was two streets away from Vega's and in the general direction of the refinery, found a knife and shopping bag in his backyard and called 9-1-1. Police responded, and recovered from Cassio's yard two knives, a black mask, and a cut black zip tie with a long dark hair strand caught in the clasp. They also found a plastic bag containing a white dust mask. Three years later, on August 29, 2018, shortly before the trial commenced, it was discovered that one of the knives had a screw-off handle. In the handle, police found a digital media card containing court documents from another case involving defendant.

Expert forensic evidence revealed that defendant could not be excluded as a match for DNA found on the inside of the black mask, dust mask, and on one of the knives found in Cassio's backyard. Defendant also could not be excluded as a match for DNA found in a glove discovered under a patio chair at Vega's house. Vega could not be excluded as a source of the hair found on the zip tie,

A-1995-18

which the medical examiner testified was consistent with having caused the ligature marks on her neck.

Defendant did not testify or call any witnesses.

II.

Defendant moved pretrial to suppress the statement he gave to law enforcement, and Judge Kirsch conducted a hearing pursuant to N.J.R.E. 104(c); Sergeant Sofia Santos of the Union County Prosecutor's Office was the only witness. Santos testified that defendant was advised of his Miranda rights, acknowledged that he understood them, waived those rights, responded to all questions, and never asked to stop the interview or speak to an attorney. Santos began the interview by telling defendant the investigators were not there to speak with him about the trespassing charges for which he had been arrested.

Santos acknowledged that when she interviewed defendant on the morning of December 10, 2015, he had been in custody for several days. On cross-examination, Santos also acknowledged that she did not know and did not check whether defendant had applied for representation by the Public Defender. In fact, defendant had completed an application on December 8. Defense counsel asserted that the investigators secured the statement in violation of defendant's Sixth Amendment right to counsel.

10

In a comprehensive written decision, Judge Kirsch denied defendant's motion. Citing State v. Perez, 334 N.J. Super. 296 (App. Div. 2000), and State v. Larry, 211 N.J. Super. 221 (App. Div. 1986), the judge concluded that "[c]ompleting a form requesting a public defender, or filing out a form indicating one's financial eligibility for a public defender, does not constitute a request for counsel under the Sixth Amendment." He credited Santos' testimony that at no point did defendant request an attorney, nor did he advise detectives that "he had filled out any paperwork requesting legal representation."

Before us, defendant asserts an entirely different basis to suppress the statement.[5] He contends that the waiver of his Miranda rights was not knowing and voluntary because police failed to advise him, certainly at the start and through the first half of the interrogation, why he was being questioned, i.e., about Vega's homicide, or that they had minutes earlier applied for a search warrant for his personal property at the jail. The argument is unpersuasive.

---

[5] We could choose not to address this argument, or the argument defendant makes in Point II, because neither was raised in the Law Division. See, e.g., State v. Witt, 223 N.J. 409, 419 (2015) ("[W]ith few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'" (quoting State v. Robinson, 200 N.J. 1, 20 (2009))). However, the record is complete and permits us to conduct a fulsome review of the issues as now framed.

A-1995-18

In State v. A.G.D., the Court held that officers' failure to inform the defendant that unbeknownst to him, a criminal complaint or warrant had been filed against him prior to the interrogation rendered that defendant's waiver of his Miranda rights involuntary. 178 N.J. 56, 58 (2003). The Court stated such information was "critically important" and "indispensable to a knowing and intelligent waiver of rights." Id. at 68.

The Court reaffirmed its holding in A.G.D. recently in State v. Vincenty, 237 N.J. 122 (2019). It again recognized that the critical issue in determining the voluntariness of the defendant's waiver was law enforcement's failure to advise the defendant that formal criminal charges had already been filed against him. Id. at 134 ("A.G.D. thus calls for law enforcement officials to make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges filed against him."). The facts here are clearly distinguishable. At the time of defendant's interrogation, no complaint or warrant regarding Vega's death had issued.

This case is more closely comparable to State v. Nyhammer, where the interrogating officer did not reveal to the defendant that his niece had made incriminating statements against him until midway through the questioning. 197 N.J. 383, 389–91 (2009). The Court noted "[o]nly in the most limited

circumstances" had it not applied the usual "totality-of-the-circumstances test" and adopted "a per se rule to decide whether a defendant knowingly and voluntarily waived <u>Miranda</u> rights." <u>Id.</u> at 403–04 (citing <u>State v. Reed</u>, 133 N.J. 237, 261–62 (1993); <u>A.G.D.</u>, 178 N.J. at 68).

The Court distinguished the facts from those presented in <u>A.G.D.</u>, where it said "[t]he issuance of a criminal complaint and arrest warrant . . . is an objectively verifiable and distinctive step, a bright line," which if, unknown to the defendant, meant he could not make a knowing and voluntary waiver of his <u>Miranda</u> rights. <u>Id.</u> at 404. In affirming the trial court's admission of the defendant's statement, the Court said it was

> not aware of any case in any jurisdiction that commands that a person be informed of his suspect status in addition to his <u>Miranda</u> warnings or that requires automatic suppression of a statement in the absence of a suspect warning.
>
> [<u>Id.</u> at 406.]

Instead, "failure to be told of one's suspect status still would be only one of many factors to be considered in the totality of the circumstances" when a court determines whether a defendant's waiver of rights was knowing, intelligent, and voluntary. <u>Id.</u> at 407.

A-1995-18

Defendant contends the detectives' failure to disclose they were in the process of securing a warrant for his personal property surrendered at the jail is an additional factor in the calculus, and their failure to do so meant defendant's waiver of his <u>Miranda</u> rights was involuntary.[6] Defendant cites no authority for this proposition, and, in view of the Court's explicit holding in <u>Nyhammer</u>, the point is unpersuasive.

Lastly, after the briefs were filed, we decided <u>State v. Sims</u>, ___ N.J. Super. ___ (App. Div. 2021). Defendant contends our decision there compels the conclusion that law enforcement's failure to advise him that he was a suspect in Vega's homicide and search warrants were being sought for his property rendered his waiver per se involuntary. In <u>Sims</u>, we construed <u>A.G.D.</u> and <u>Vincenty</u> to compel suppression of the defendant's <u>Mirandized</u> statement when, although police had not filed a formal complaint-warrant, they had arrested the defendant for attempted murder and failed to inform him why he was under arrest before questioning him. <u>Id.</u> at slip op. 1–2.

---

[6] From defendant's appendix, it appears that detectives were in the process of applying for the warrant when the interrogation began. They did not apply for the search warrant of defendant's home and computer until much later in the afternoon of the same day.

14

Initially, we note that "the decision of one appellate panel [is not] binding upon another panel of the Appellate Division." Brundage v. Estate of Carambio, 195 N.J. 575, 593 (2008) (citations omitted).[7] More importantly, the facts in Sims are patently different than those presented here. When police interrogated defendant in this case, he was under arrest and in custody for criminal trespass at the refinery; he was not under arrest for the homicide, which police were actively investigating at the time.

In sum, we affirm the decision to deny defendant's motion to suppress his statement to law enforcement.

III.

Before trial, defendant moved to suppress evidence obtained through execution of the two search warrants. He argued that the court should conduct a Franks[8] hearing because there were material representations made by the detective-affiant, including that defendant matched the descriptions of the intruder in Vega's home given to police. After considering oral argument, Judge Kirsch concluded there was "no basis . . . to find . . . there was a false statement

_____

[7] Moreover, the Court has now granted the State's petition for certification. ___ N.J. ___ (2021).

[8] Franks v. Delaware, 438 U.S. 154 (1978).

made" that could be characterized as a "deliberate falsehood or a statement made in reckless disregard" of the truth, and he denied defendant's motion.

Before us, defendant changes tack and now argues the search warrants were not supported by requisite probable cause.[9]  The argument requires little discussion.

A search warrant is presumed valid, and the defendant bears the burden to show that it was issued without probable cause or that the search was "otherwise unreasonable."  State v. Chippero, 201 N.J. 14, 26 (2009).  An application for a search warrant "must satisfy the issuing authority 'that there is probable cause to believe that . . . evidence of a crime is at the place sought to be searched.'"  State v. Boone, 232 N.J. 417, 426 (2017) (quoting State v. Jones, 179 N.J. 377, 388 (2004)).

"Reviewing courts 'accord substantial deference to the discretionary determination resulting in the issuance of the [search] warrant.'"  Id. at 427

---

[9]  In his reply brief, defendant for the first time reasserts the claim of material misrepresentations in applications for the warrants compelled a Franks hearing. "[R]aising an issue for the first time in a reply brief is improper."  Goldsmith v. Camden County Surrogate's Office, 408 N.J. Super. 376, 387 (App. Div. 2009) (quoting Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001)).  Nevertheless, because the issue was raised in the trial court, it suffices to say we agree with Judge Kirsch's reasoning and reject the argument.

A-1995-18

(quoting Jones, 179 N.J. at 388).  "Thus[,] when the adequacy of the facts offered to show probable cause is challenged after a search made pursuant to a warrant, and their adequacy appears to be marginal, the doubt should ordinarily be resolved by sustaining the search."  Jones, 179 N.J. at 388–89 (alteration in original) (quoting State v. Kasabucki, 52 N.J. 110, 116 (1968)).

Here, the issuing judges were told that defendant generally fit the description of the intruder Jack and Don saw in Vega's home, defendant's clothing generally fit the description of the person Williams saw running from the house carrying a bag, defendant was arrested in relatively close proximity to the house carrying a bag, and defendant was Rivera's former boyfriend and familiar with the interior of Vega's home.  The items the State sought to search pursuant to the first warrant were those defendant wore less than two hours after leaving the house, and it was very probable the buccal swabs could yield evidence linking defendant to the scene of the crime or the victim.

In seeking the second warrant, the State introduced all this, plus defendant's sister's statement that he lived with her and was the sole user of the single computer in the home.  We conclude there was sufficient probable cause to support the issuance of both warrants.

IV.

On September 24, 2018, after the first few days of trial, the prosecutor served written notice on the judge and defendant that her office had just gained access to data on one of the cell phones seized from defendant upon his arrest three years earlier. According to Judge Kirsch's written decision of October 2, issued after further briefing by both sides,[10] the State claimed "the forensic tools available" in 2015 "were unable to bypass the password protection" on the phone, but on September 21, 2018, a detective was able to "forensically dump" the device's contents "using current forensic technology." This revealed evidence including: (1) defendant's internet search history for "witch [sic] gloves do not leave fingerprints" and "how to make a hijab"; (2) information that placed the phone at the cell towers closest to Vega's home at the time of the crime and closest to the railroad tracks near the refinery at the time of defendant's arrest; and (3) a Google Maps screenshot of directions to the Linden train station, where defendant told police in his statement that he had changed his clothing before being arrested. The State sought to use this evidence in its case-in-chief.

---

[10] The parties waived any oral argument, so we rely upon the judge's written decision to set the stage for what followed.

A-1995-18

Defendant objected "based on unfair surprise and undue prejudice." Counsel asserted it would take four-to-six weeks to find an expert and conduct a forensic analysis, and had he known about the evidence before trial, he would have tailored his opening and questioned the witnesses accordingly.

In his written decision of October 2, the judge concluded defendant had "no reason to believe that the contents of the phone would become an issue" because the State never put him on notice that the search efforts were ongoing. The judge rejected any idea that a "continuance or delay" would allow defendant to prepare a response to the new evidence and "mitigate the prejudice . . . undeniably create[d]" if the evidence were admitted. Several witnesses had already testified, and defendant had "committed to a trial strategy."

Judge Kirsch denied the State's motion to admit the evidence during its case-in-chief. However, in a footnote in his written decision, the judge stated,

> If the defense, on cross-examination or in its case-in chief, presents testimony that "opens the door" by raising facts incompatible with the newly obtained evidence, upon application by the [S]tate, the court reserves the right to allow the [S]tate, either through redirect examination, cross-examination or through rebuttal testimony, to present some or all of the newly obtained evidence.

On the last day of the State's case, defense counsel told the judge that he had advised defendant "he could open the door and the results of that cell phone

A-1995-18

could be used to cross-examine him" if he testified.  The judge replied, "[u]ndoubtedly so."

Later that day, defense counsel told Judge Kirsch he "ha[d] been in communication with [defendant] now for weeks about his decision to testify or not," and that when the issue of the new cell phone evidence came up and the court made its ruling, defendant "made the election not to testify."  The judge immediately responded; he wanted to be "clear" that he "ha[d] not in any regard issued an advisory opinion" on whether the evidence would be admitted if defendant testified.  He made clear that he "[did not] want [defendant's] decision not to testify in any way to be related to a theoretical possibility that he may open the door on something."  Counsel replied that he did not think this issue was defendant's "sole concern," but that it was "a consideration . . . [out] of many that he could open the door and that cell phone evidence could come in."

Judge Kirsch then questioned defendant directly and asked if his decision not to testify was made freely and voluntarily, and defendant responded in the affirmative.  The judge said his ruling on the newly discovered evidence was intended to "put the [d]efense on notice that it [was] possible . . . some or all of that evidence could come in if the [d]efense opened the door," but he "did not rule . . . [any evidence] was automatically admissible."  Defense counsel

interceded and repeated that possible admission of the new evidence was "something that [defendant] considered in his overall decision not to testify," but it was not the only consideration. After some additional discussion, Judge Kirsch found that defendant's decision not to testify was made knowingly, voluntarily, and intelligently.

Defendant argues before us that the judge impeded his right to testify by "conditioning" that right "on the possibility of being confronted with" the cell phone evidence discovered mid-trial by the State. He argues the judge substantively erred by suggesting this evidence might be admissible to impeach defendant during cross-examination or on rebuttal if defendant "opened the door." We again disagree.

It is axiomatic that a defendant's right to testify at trial on his own behalf is fundamental and "essential to a fair trial." State v. Daniels, 182 N.J. 80, 97 (2004) (quoting Pointer v. Texas, 380 U.S. 400, 403 (1965)). Whether to testify or not is the defendant's decision to make with the benefit of counsel's advice. State v. Bey, 161 N.J. 233, 311 (1999). However, "[t]o be sure, defendants who testify are obligated to tell the truth like all other witnesses." Daniels, 182 N.J. at 97 (citing State v. Burris, 145 N.J. 509, 530 (1996)). "Indeed, the right to

testify is neither a license to commit perjury nor a shield against contradiction." Ibid. (citing Burris, 145 N.J. at 530).

Initially, we reject any assertion that the judge imposed conditions on defendant's right to testify by including a footnote of caution in his written opinion. In colloquy with defense counsel and directly with defendant, Judge Kirsch made clear that he had not made any ruling on the admissibility of the evidence. This was consistent with the long-recognized maxim that "[a] trial judge generally should not rule on the admissibility of particular evidence until a party offers it at trial." State v. Cordero, 438 N.J. Super. 472, 484 (App. Div. 2014) (quoting State v. Cary, 49 N.J. 343, 352 (1967)).

The critical issue here is substantive, i.e., whether late-disclosed evidence, ruled inadmissible on the State's case-in-chief as essentially a discovery violation sanction, could be used to impeach defendant if he testified? We agree that it could, subject of course to its relevancy, and the judge's inherent discretionary ability to exclude evidence pursuant to N.J.R.E. 403, which provides:

> [R]elevant evidence may be excluded if its probative value is substantially outweighed by the risk of:
>
> > (a) Undue prejudice, confusion of issues, or misleading the jury; or

(b) Undue delay, waste of time, or needless
presentation of cumulative evidence.

Rule 3:13-3(f) imposes a continuing obligation on the State to provide discovery and when the disclosure is made late in the proceedings, the Rule permits the trial court to fashion an appropriate remedy, including granting a continuance or delay, prohibiting admission of the evidence not previously disclosed, or entering "such other order as it deems appropriate." In fashioning the appropriate remedy under Rule 3:13-3(f), the judge should consider the absence of any design by the State to mislead, surprise to the defendant, and the presence or absence of prejudice to the defense. State v. Washington, 453 N.J. Super. 164, 191 (App. Div. 2018) (citing State v. Zola, 112 N.J. 384, 418 (1988)). We defer to the trial court's exercise of its broad discretion in fashioning a proper remedy. State v. Wolfe, 431 N.J. Super. 356, 363 (App. Div. 2013).

Here, Judge Kirsch considered the appropriate factors in excluding the evidence from the State's case in chief. He did not find any intention on the State's part to mislead defendant, although he did conclude that defendant was unaware of the State's continued efforts to access the phone's contents. In other words, defendant was surprised when the prosecutor announced the success of the State's attempts and the evidence obtained. The judge also weighed the

23

substantial prejudice to the defendant if the new evidence were admitted. Judge Kirsch barred the State from using the evidence affirmatively but held open the possibility that the evidence could be used to impeach defendant if he testified.

Without question, our courts have consistently held that evidence obtained in violation of a defendant's Constitutional rights may nonetheless be used to impeach the defendant should he or she testify. See, e.g., State v. Harris, 181 N.J. 391, 440 (2004) ("Statements taken in violation of Miranda may be used for impeachment when they were given freely and voluntarily." (citing Harris v. New York, 401 U.S. 222 (1971); Burris, 145 N.J. at 525)); see State v. Battle, 256 N.J. Super. 268, 275 (App. Div. 1992) ("[I]llegally seized evidence may be used . . . to impeach a defendant[.]" (citing United States v. Calandra, 414 U.S. 338, 350–51 (1974), then United States v. Havens, 446 U.S. 620, 627 (1980))). In Havens, the United States Supreme Court held that evidence obtained in an illegal police search could be admitted against the defendant if he opened the door to its admission by testifying untruthfully. 446 U.S. at 626–28. The Court found that the exclusionary rule was "adequately implemented by denying the government the use of the challenged evidence to make out its case in chief." Id. at 627–28.

If neither the United States Constitution nor our State Constitution bars the use of illegally obtained evidence, it is hard to fathom a rationale for totally barring the use of evidence that was obtained lawfully and without prosecutorial misconduct,[11] but simply was unavailable to the State until after trial began. Defendant cites no case to support that proposition.

This case is distinguishable from State v. Smith, 224 N.J. 36 (2016), which defendant does cite. There, six weeks after a robbery, police located the victim's cellphone when they arrested a third-party. Id. at 38–39. The prosecutor, however, did not learn of this until the middle of the defendant's trial. Id. at 39. Although the judge "took alternate measures to try to remedy the belated disclosure," he repeatedly denied the defendant's motions for a mistrial. Ibid. The Court concluded that the trial court abused its discretion by not granting a mistrial. Ibid.

Here, defendant never sought a mistrial. More importantly, in Smith, the new evidence was exculpatory, pointing to a third-party's guilt, and the Court reasoned that the defendant needed time to "investigate and follow up on the

---

[11] In State v. Sosinski, for example, we held that the defendant's statement could not be used for impeachment purposes, given the assistant prosecutor's explicit direction to the investigating officer not to provide Miranda warnings. 331 N.J. Super. 11, 22–23 (App. Div. 2000).

A-1995-18

very important development." Id. at 43. As a result, the trial judge's insistence on continuing the proceedings and preventing defense counsel from cross-examining State witnesses about the new evidence "implicat[ed] the defendant's right to a fair trial." Id. at 48.

Here, the evidence found on defendant's cell phone was highly incriminating. In addition to being independently probative of defendant's conduct on the night in question, it would have impeached much of the statement defendant provided to investigators and which was already before the jury. And, unlike Smith, the new evidence was always peculiarly within the realm of defendant's knowledge.

In sum, Judge Kirsch did not procedurally or substantively impede defendant's right to testify on his own behalf.

V.

Defendant contends his sentence was excessive and resulted from Judge Kirsch's findings regarding aggravating sentencing factors and his failure to find mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) (defendant's lack of prior criminal history). We affirm the sentence.

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). As the Court has said:

The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)).]

Whether a sentence will "gravitate toward the upper or lower end of the [statutory] range depends on a balancing of the relevant factors." State v. Case, 220 N.J. 49, 64 (2014) (citing Fuentes, 217 N.J. at 72).

Judge Kirsch found aggravating factors one, the nature and circumstances of the offense, including whether it was committed in an "especially heinous, cruel, or depraved manner"; three, the risk defendant would reoffend; and nine, the need to deter defendant and others. N.J.S.A. 2C:44-1(a)(1), (3), and (9). Defendant does not challenge the application of aggravating factors one or nine on appeal. Instead, defendant argues the judge erred in finding factor three by citing defendant's "lack of remorse" and continued assertion of innocence, and the pendency of the Essex County indictment.

However, Judge Kirsch fully explained his reasons for concluding defendant presented a risk to re-offend. Moreover, while we have said a

protestation of innocence is "not a germane factor in the sentencing decision," State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985), our Court has recognized the relevance of a defendant's denial of responsibility to a factor three finding. State v. Carey, 168 N.J. 413, 427 (2001). In addition, Judge Kirsch did not consider the pending Essex County indictment as an independent basis for finding factor three. Rather, he referred to those charges in the context of defendant's motivation to kill Vega and "eliminate any potential witnesses" in the pending trial. After describing in detail the evidence adduced at trial, Judge Kirsch found mitigating factor seven applied but gave it "very little weight under the facts and circumstances of this case."

We conclude there was no mistaken exercise of discretion, and the sentence imposed on defendant for the murder of Vega does not shock our collective judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1995-18